# State of New York Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 43  SSM 10
The People &c.,
   Respondent,
  v.
Fabian Greene,
   Appellant.

Submitted by Margaret E. Knight, for appellant.
Submitted by Philip V. Tisne, for respondent.

MEMORANDUM:

The order of the Appellate Division should be modified by vacating the conviction for count 3 and dismissing that count of the indictment and, as so modified, affirmed.

A multiplicitous indictment "creates the risk that a defendant will be punished for, or stigmatized with a conviction of, more crimes than [they] actually committed" (*People v Alonzo*, 16 NY3d 267, 269 [2011]).  Even when the multiplicitous convictions do not increase the defendant's sentence, the stigma of impermissible convictions endures and must be remedied.  Thus, when a defendant is convicted of multiplicitous charges, the proper remedy is vacatur of all but one of the multiplicitous convictions and dismissal of those counts of the indictment, regardless of whether that corrective action has any effect on the defendant's sentence.  Here, there is no dispute regarding the Appellate Division's conclusion that the two counts of perjury of which defendant was ultimately convicted were multiplicitous.  As the People concede, the proper remedy is therefore dismissal of one of the convictions.

Defendant's argument that the trial court permitted a witness to impermissibly instruct the jury on the law concerning materiality does not warrant reversal of his other convictions.  Defendant's remaining contentions are unpreserved for appellate review.

WILSON, Chief Judge (concurring):

I concur but write separately because Mr. Greene's case illustrates a fundamental problem with the way in which minor antisocial behavior results in a wholly disproportionate result.

## I.

Mr. Greene appeared pro se below.  Although his grand jury testimony is inconsistent with the facts adduced at trial, by the time of trial both he and the People agreed to the same set of facts: Mr. Greene, in his opening, asked the jury to acquit him if the People failed to prove beyond a reasonable doubt that he had the requisite criminal intent to commit grand larceny and perjury.

According to the complainant, Jayne Chu, at approximately 10:10 P.M. on April 26, 2017, she and her boyfriend Benjamin Olschner were returning home from a date followed by a drink with a friend at a bar.  To avoid walking on the sidewalk in front of a funeral home, which Ms. Chu considered bad luck, she and Mr. Olschner left the sidewalk and entered the street.  Mr. Greene, who was riding his bicycle the wrong way, swerved to avoid them and yelled at them that they were "in the fucking way."  Both Ms. Chu and Mr. Greene had something to drink shortly before their encounter.  According to Ms. Chu, Mr. Greene was wearing "a really nice outfit" and a "distinctive straw cowboy hat."  Ms. Chu yelled "something not very nice back" to the effect that Mr. Greene was in the way.  Mr. Greene stopped and rode back to where Ms. Chu and Mr. Olschner were, and Ms. Chu and Mr. Greene (but not Mr. Olschner) got into what Ms. Chu described as a "dumb argument" about who was in the wrong for the near collision, during which "we both got more and more excited as we were arguing with each other."

Ms. Chu, who describes herself as "not the kind of person to step away that easily," walked with Mr. Greene from the street to the sidewalk corner to continue their argument and were standing about a yard apart and "yelling at each other" for about five minutes.

Mr. Greene identified himself to the couple several times as Fabian Greene, and called himself "the King of Chinatown," whom everyone knows.  At points, Ms. Chu said they "were talking and we were not yelling at each other" and both had said "let's just agree to disagree" about who was in the wrong for the near collision.  At the point where the verbal altercation "really escalated," Ms. Chu said she would call the police, and when she took out her phone and attempted to take a photo of Mr. Greene, he grabbed her phone, hopped on his bike and rode off, leaving his bag behind.  Ms. Chu yelled at him, "you left your bag, you moron," but Mr. Greene continued riding away, and Ms. Greene took his bag while Mr. Olschner used his phone to call the police.

Because Mr. Greene had repeatedly announced his real name to Ms. Chu, she and Mr. Olschner were immediately able to find his public profile on Facebook, provide that to the police, and track her phone using Mr. Olschner's phone.

The police located Mr. Greene with Ms. Chu's phone less than 30 minutes after Mr. Greene rode off with it.  He was seated at a nearby internet café.  Mr. Greene was arrested and held in pretrial detention for 13 months.  At trial the jury convicted him of one count of fourth-degree larceny for taking Ms. Chu's phone and two counts of first-degree perjury in connection with his grand jury testimony; the court sentenced Mr. Greene to four to eight years in prison.

In short, two New Yorkers got into a protracted argument about whether a jaywalker or a wrong-way cyclist was in the wrong.  Ms. Chu was uninjured and received her phone shortly after Mr. Greene took it.  Mr. Greene did not seek out a victim to attack or an object to steal, but spontaneously reacted in the midst of a heated argument by taking Ms. Chu's

phone when she attempted to take his picture.  As Ratso Rizzo might attest, this case arose from a quotidian dispute of the kind familiar to most New Yorkers: two people in a shouting match after nearly bumping into each other in the street.

Mr. Greene had previously been convicted of several offenses, consisting of misdemeanors (including trademark counterfeiting and turnstile jumping) and nonviolent felonies.  Mr. Greene was represented by a defense attorney at sentencing; his lawyer explained that he needed mental health services, not a lengthy incarceration.  The People asked that all of Mr. Greene's convictions—for grand larceny and for perjury—run concurrently, for a sentence of 3.5 to 7 years.  Instead, the court ran the sentences for larceny and perjury consecutively, for a total of 4 to 8 years.

Doubtless, property theft is not an acceptable escalation of a verbal conflict.  But Mr. Greene, by his counsel's representation at sentencing, by his own statements at that time, and by reference to the events leading up to this conviction, is in need of mental health services.  Persons intent on robbery do not typically announce their real names to their victims or get into long public arguments ranging from conciliatory to threatening before absconding with property.  Instead of providing a path to those services, the criminal justice system ordered Mr. Greene incarcerated for at least four years, at an approximate cost to taxpayers of nearly a half a million dollars—closer to a million should he serve the full eight-year term.[1]

---

[1] *See* Julian Harris-Calvin et al., *The Cost of Incarceration in New York State*, Vera Institute (Oct 31, 2022), available at https://www.vera.org/the-cost-of-incarceration-in-new-york-state#:~:text=New%20York%20invests%20tens%20of,more%20than%20%2482%2C00

At trial, Ms. Chu offered that she should have walked away, and in retrospect wished she had done so. Mr. Greene, too, retrospectively wished he had not persisted in the argument. Our justice system should not be incapable of asking Ms. Chu whether she would prefer directing Mr. Greene to mental health resources instead of a lengthy prison stay, or incapable of making the decision that regardless of what the law allows by way of incarceration, Mr. Greene and the broader community would be better served by treatment rather than incarceration. The Unified Court System has taken baby steps in that direction, but Mr. Greene's case powerfully illustrates how much more could be done.

Treating incarceration as the default response to individuals convicted of low-level offenses has outsized deleterious consequences that, ultimately, make our communities less safe: the cycle of incarceration further destabilizes these individuals; mental health treatment in prison is costlier than community-based treatment; individuals with mental illness are at greater risk of detention in prison and extended incarceration; prison mental health resources are often inadequate; and individuals living with mental illness face greater risk of harm and abuse while behind bars.[2]

---

0%20per%20year (last accessed Dec 28, 2023) ("In state prisons, New York spends an average of . . . nearly $115,000 . . . to incarcerate one person").

[2] *See* State Justice Institute, Improving the Justice System Response to Mental Illness: A Fact Sheet (Apr 20, 2020); Joseph Vanable, NAMI, The Cost of Criminalizing Serious Mental Illness, https://www.nami.org/Blogs/NAMI-Blog/March-2021/The-Cost-of-Criminalizing-Serious-Mental-Illness#:~:text=The%20average%20cost%20for%20psychiatric%20treatment%20in%20a,have%20a%20better%20chance%20of%20bringing%20about%20recovery (Mar 24, 2021) (based on the average cost of psychiatric treatment in a community-based hospital "for an adult, the cost of 35 to 83 days in prison would provide the financing of a hospitalization that would have a better chance of bringing about recovery"); Megan J. Wolff, Weill Cornell Medicine Psychiatry, Fact Sheet: Incarceration and Mental Health,

Another approach worth pursuing is sometimes referred to as "restorative justice"—a non-punitive approach designed to facilitate reconciliation between an offender and a victim through dialogue and interpersonal restitution.  The practice "is based on the values of shared power, voluntary participation, and equal voice" (Shailly Agnihotri & Cassie Veach, *Reclaiming Restorative Justice: An Alternate Paradigm for Justice*, 20 CUNY L Rev 323, 326-327 [2017]).  Restorative justice models in the criminal justice system attempt to "shift the focus from the relationship between the State and the accused to the human relationships impacted by the crime" (*id.* at 336).[3]

Here, Ms. Chu explicitly stated that she wished the criminal justice system had not become involved in the dispute.  When asked why she did not walk away from the argument she testified that she "felt like [they] were actually engaging with each other . . . connecting with each other," and that she wished they had walked away because then each of the parties could be elsewhere instead of having to endure a criminal process.  She went on to testify, however, that she "didn't walk away because [she] felt like [Mr. Greene]

---

https://psychiatry.weill.cornell.edu/research-institutes/dewitt-wallace-institute-psychiatry/issues-mental-health-policy/fact-sheet-0#footnoteref48_2jzqryh  (last updated May 30, 3017) ("prison conditions . . . are strongly correlated with emerging and worsening psychiatric symptoms. . . . psychiatric symptoms may be difficult to distinguish from aggressive or deviant behavior, resulting in further punishment").

[3] A reputable meta-analysis of emerging scholarship on restorative justice found that "restorative justice programs are a more effective method of improving victim and/or offender satisfaction, increasing offender compliance with restitution, and decreasing the recidivism of offenders when compared to more traditional criminal justice responses (i.e., incarceration, probation, court-ordered restitution, etc.)" (Jeff Latimer, Craig Dowden & Danielle Muise, *The Effectiveness of Restorative Justice Practices: A Meta-Analysis*, 82 Prison J 127, 138 [June 2005]).

wasn't giving [her] the validation to hear what [she] wanted to say . . . [a]nd that [she] was being stubborn . . . and dumb."

A restorative justice approach would have not only prevented the protracted prosecution—which burdened both parties, taxpayers and the courts—but it might have given Ms. Chu an opportunity to express her frustration with Mr. Greene in a direct and productive dialogue, and an opportunity to feel validated in that completely reasonable frustration. Furthermore, it might have given the parties the opportunity to reach conciliation instead of continuing to confront each other in an adversarial posture, and it could have given the system a chance to offer Mr. Green mental health support in a community, non-carceral setting.

The reflexive incarceration of people like Mr. Greene is not uncommon. We need to build a system that better protects our society from antisocial behaviors by offering options superior to incarceration, both in effect and cost.

On review of submissions pursuant to section 500.11 of the Rules, order modified by vacating the conviction for count 3 and dismissing that count of the indictment and, as so modified, affirmed, in a memorandum. Chief Judge Wilson and Judges Rivera, Garcia, Singas, Cannataro, Troutman and Halligan concur, Chief Judge Wilson in a concurring opinion.

Decided January 11, 2024